UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANGELA J. FIELDS,

      Plaintiff,                              Case No. 17-cv-11812
                                                   Hon. Matthew F. Leitman

v.

PIERRE OCTAVIUS ASHFORD, *et al.*,

      Defendants.

_____/

## ORDER GRANTING DEFENDANTS' MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF GARY McDONALD (ECF NO. 81)

This action arises out of an automobile accident between Plaintiff Angela Fields and Defendant Pierre Octavius Ashford that occurred on I-96 in Milford, Michigan. Fields' Ford Edge crashed into the back of Ashford's semi-truck shortly after Ashford pulled his truck from the shoulder into Fields' lane of travel. The central dispute between the parties is: what caused the accident? Fields says that Ashford caused the wreck by pulling into her lane and leaving her "no time at all to avoid [the] collision." (Fields Resp. Br., ECF No. 82, PageID.2337.) Ashford counters that he is not to blame because Fields had enough time to see his truck and to avoid the accident by braking and/or changing lanes.

Fields has retained accident reconstructionist Gary McDonald to support her causation theory. Ashford and Defendants Corr Transport, Inc. and Dakota Lines,

Inc. have moved to exclude McDonald's opinions on the ground that his opinions do not rest upon a reliable foundation. (*See* Mot. to Exclude, ECF No. 81.) The Court will grant Defendants' motion.

McDonald's deposition testimony makes clear that he cannot reliably support Fields' causation theory. Indeed, McDonald admitted that he did not conduct any analysis that would allow him to "say" that Fields' "didn't have enough time" to avoid the accident. (McDonald Dep. at 35, ECF No. 81-1, PageID.2258.) Moreover, McDonald's expert report and the remainder of his deposition testimony demonstrate that he did not perform a reliable evaluation of the crash and that none of his causation opinions rest upon a reasonable foundation. His expert report is one page and lists conclusions without any causation analysis, and his deposition testimony revealed that he did not employ any analytical methodology, much less a reliable one. Therefore, for all of these reasons, the Court **GRANTS** Defendants' motion and **EXCLUDES** McDonald's testimony in its entirety.

# I

## A

The accident between Fields and Ashford occurred on May 25, 2016. Immediately prior to the accident, Ashford had stopped his semi-truck on the shoulder of I-96. (*See* Ashford Dep. at 37, ECF No. 71-2, PageID.1592.) Ashford then pulled back into the right lane of traffic at a speed of roughly 20-to-25 miles

per hour. (*See id.* at 45, PageID.1600.)  Fields was driving in that same lane. (*See* Fields Dep. at 43, ECF No. 71-3, PageID.1695.)  Shortly after Ashford re-entered the highway, Fields crashed into the rear of Ashford's semi-truck. (*See id.* at 45-46, PageID.1697-98.)  Both parties have engaged expert witnesses to support their contention that the other party is at fault for the crash.

**B**

Fields' proposed accident-reconstruction expert is McDonald.  McDonald is the President of Magnetic North Consulting, and he is a former officer with the Michigan State Police. (*See* McDonald Dep. at 7-10, ECF No. 81-1, PageID.2251-2252.)  He is also a member the Michigan Association of Traffic Accident Investigators and the International Association of Accident Reconstruction Specialists. (*See id.* at 9-10, PageID.2252.)

Fields retained McDonald in June of 2016. (*See id.* at 17-18, PageID.2254.) Thereafter, McDonald inspected Fields' car and reviewed the following documents:

- A Michigan State Police "UD-10" crash report;
- An unidentified "fee calculation form" that McDonald acquired through the Freedom of Information Act;
- A Michigan State Police report from the "Traffic Crash Reconstruction Unit";
- Unidentified Detroit Diesel Engine Control "reports"; and
- A Michigan State Police "Police Incident Report."

(McDonald Expert Rpt., ECF No. 81-1, PageID.2246.)

On June 5, 2018, McDonald submitted his expert report. (*See id*.)  In that report, he opines that Ashford "was the cause of [the] crash." (*Id.*, PageID.2246-2247.)  But the report contains no analysis whatsoever to support or explain that conclusion.  Instead, the report – which consists of a mere 329 words and less than a single full page of text – simply lists a handful of facts related to the accident and then states McDonald's conclusion that Ashford caused the crash.  In full, the report states as follows:

> Based on my review of the above listed items and materials I have the following opinions. This crash occurred on I-96 approximately a 1/2 mile East of the Milford Road-Oakland County in the Eastbound lane speed limit 70 mph. The vehicles involved were a 2005 freightliner semi-tractor with trailer in a 2010 Ford Edge.
>
> The semi-tractor trailer with being operated by Pierre Octavius Ashford, 31 years old of Southfield Michigan. The Ford Edge was being operated by Angela Jeanne fields, 56 years old.
>
> The semi-tractor/trailer was on the right-hand shoulder and merged onto the right-hand lane of I-96 and was struck from behind by the Ford Edge.
>
> The review of the Michigan State Police Report, scale drawings and photographs show and indicate that impact location of this crash was in the right hand lane of the Eastbound I-96.
>
> The impact of the Ford Edge such that the ACM "black box" was damaged to the extent that it could not be downloaded with the CDR tool "computer" for a speed determination.

During the examination of the Ford Edge it was noted that the speedometer needle was a 92 mph and the rpm needle was at 2100 RPM. The rpm's at 2100 and the speed of 92 mph do not appear usable to indicate a true and accurate method of speed determination thus no speed determination was calculated for the Ford Edge.

Mr. Ashford driver of the 2005 freightliner stated that he pulled off the right-hand shoulder onto the right-hand lane of I-96 and was traveling 20 to 25 mph when he was impacted by the Ford Edge.

Ms. Fields driver of the Ford Edge stated that she was traveling approximately 70 mph speed limit and never slowed or braked prior to impact.

It is in my opinion based on my review and analysis of this crash Mr. Ashford was the cause of this crash by entering onto the right lane of I-96 in front of Ms. Fields path of travel.

(*Id.*, PageID.2246-2247.)

## C

### 1

On June 4, 2019, McDonald appeared for a deposition in this action. He testified that he had reached the following conclusions: "Mr. Ashford failed to yield, he was driving below the minimum speed for commercial vehicles on the freeway and he took away Ms. Fields' right-of-way." (McDonald Dep. at 24, ECF No. 81-1, PageID.2255.) Based upon these conclusions, McDonald opined that Ashford was "a hundred percent" at fault for the accident. (*Id.* at 26, PageID.2256.)

During McDonald's deposition, Ashford's counsel asked McDonald to identify any evidence that Ashford left Fields no time to avoid the accident. (*See id.* at 34-36, PageID.2258.) In response to those questions, McDonald identified *only* Fields' own testimony that Ashford's truck "jumped right out in front of her." (*Id.* at 35, PageID.2258.) He then admitted that, apart from Fields' version of events, he had "no evidence" that Ashford had, in fact, "jumped" in front of Fields. (*Id.*) *More importantly, McDonald admitted that his own work and analysis did not allow him to "say" that Fields "didn't have enough time" to avoid the accident.* (*Id.*) And McDonald further conceded that he could not explain why Fields did not brake, did not swerve, and/or did not slow down before the crash. (*See id.* at 34, PageID.2258.) McDonald may not have been able to explain why Fields did not brake, swerve, or slow down because his analysis did not account for "perception-reaction time" and because he did not "factor in perception time."[1] (*Id.* at 30, PageID.2257.)

---

[1] In Fields' opposition brief, she says that McDonald "made numerous mathematical calculations to check and support his conclusions," including calculations related to "known or accepted perception reaction time." (Fields Resp. Br., ECF No. 82, PageID.2236.) But McDonald was asked directly at his deposition if he "[a]t any point [] factor[ed] in perception time," and McDonald unequivocally answered "no." (McDonald Dep. at 30, ECF No. 81-1, PageID.2257.)

**3**

McDonald's deposition testimony also revealed that he had done only limited work before reaching his conclusions. More specifically, McDonald acknowledged that apart from reviewing the five pieces of evidence listed in the bullet points above (in Section (I)(B)) and inspecting Fields' vehicle, he did not review any other evidence and did not do any modeling or testing before reaching his opinions and issuing his expert report:

> Q: So looking at your report … you listed out five items that were reviewed in conjunction with this report: the UD-10, the State of Michigan Freedom of Information Act fee calculation form, a [Michigan State Police] police report [from the] traffic crash reconstitution unit, the [Detroit Diesel Engine Control] reports [] and the [Michigan State Police] police incident report. Is that correct?
>
> A: Correct.
>
> A: Did you review, prior to issuing your report … any other evidence, other than those five items?
>
> A: No.
>
> Q: Other than the vehicle inspection [of Fields' car] did you perform any other independent investigation?
>
> A: No.
>
> Q: Have you inspected any exemplar vehicles in conjunction with this case?
>
> A: No.

Q: Have you done any testing?

A: No.

Q: Have you done any modeling in conjunction with this case?

A: No.

[….]

Q: Have you created any animations in conjunction with the Fields case?

A: No.

Q: Have you run any simulations in conjunction with the Fields case?

A: No.

(*Id.* at 20-22, PageID.2254-2255.) In addition, McDonald testified that he did not perform a "crush analysis," a "scene or grade analysis," or a "speed of impact" analysis related to the accident. (*Id.* at 22, 34, PageID.2255, 2258.) Nor did he ever conduct any analysis "to calculate the Ford Edge's speed." (*Id*. at 29, PageID.2257.) McDonald further admitted that he "never examined" Ashford's truck, never "made any conclusions specifically regarding the truck," and never rendered "an opinion as to the speed of [Ashford's] lane change" based on his "scientific" or technical "expertise." (*Id.* at 30, 32-33, PageID.2257-2258.) Finally, McDonald acknowledged that he did not "rely on any scholarly articles or treatises" in reaching his opinions. (*Id.* at 24, PageID.2255.)

**4**

Long after McDonald reached his opinions and issued his report, he did some additional work related to the accident. For instance, two days prior to his deposition – and nearly a full year after he issued his report containing his causation opinion – McDonald completed some handwritten mathematical calculations.[2] (*Id.* at 25, PageID.2256.) During McDonald's deposition, Ashford's counsel asked McDonald to explain the meaning of those calculations. McDonald offered the confusing explanation below:

> Q: I'm looking at the handwritten notes that you provided me. Could you explain kind of what these numbers working from the top of the page to the bottom of the page, kind of what those numbers all mean?
>
> A: Yes.
>
> Q: And what you're calculating in that sheet.
>
> A: Basically, I'm asking myself questions and answering them. 92 miles an hour was the question. In the report it indicates that the speedometer was stuck at 92 miles an hour, which converts to 134 feet per second. Mr. Ashford said he was out on the road for probably a minute, which is 60 seconds. That means that Miss Fields was 8,088 feet away when he entered the road for a minute. 30 seconds, she was 4,000 feet behind; 15 seconds, she was 2,022 feet per second; 10 seconds, she was 1,348 feet; 5 seconds, she was 674 feet.

_____

[2] The handwritten calculations were identified as Exhibit 5 during McDonald's deposition and are included in the record here at ECF No. 81-1, PageID.2301.

Q: So essentially, that chart which would constitute, I guess, the second chunk of writing there –

A: Yes.

Q: - that chart is essentially a cross-analysis of the time that she would have been on the roadway versus how far she would have been away.

A: Based on certain times.

Q: So that's not an assertion of exactly how long he was on the roadway or anything like that. You're just saying if it was this, it's that, correct?

A: Correct.

Q: Please continue.

A: The next one says 70 miles an hour is 102.6 feet per second. I converted that into the same 60, 30, 15, on the road for 60 seconds and she was traveling 92 miles an hour, she'd be 8,000 feet away. But he saw her, so she had to be closer than that.

Q: It was your testimony earlier that you did not believe that the 92 miles per hour was an accurate speed reading. Is that correct?

A: That's correct.

(*Id.* at 36-39, PageID.2258-2259.)

Later during McDonald's deposition, Fields' counsel returned to the topic of McDonald's handwritten calculations. Like the colloquy between defense counsel and McDonald concerning the handwritten calculations, the exchange between Fields' counsel and McDonald about the calculations – reproduced verbatim below

10

– is difficult to understand. That difficulty stems in no small part from the fact that, as the italicized portions of the colloquy below indicate, some of the key questions are imprecise and McDonald did not directly or clearly answer certain important questions:

> Q: Now, the hand calculations that you completed Sunday, I think they are exhibit 5?
>
> A: Yes.
>
> Q: It's my understanding that you were thinking this through in preparation for the deposition and you just did some calculations to see if Mr. Ashford's testimony made any sense, correct?
>
> A: Correct.
>
> Q: And these calculations indicate that *they*[3] don't make any sense, correct?
>
> A: *They* don't make any sense to me and – some of them don't.
>
> Q: Right. And the point is, is that I think it was 102.67, I guess exactly, feet per second, that a person driving at 70 miles an hour could lawfully proceed down the highway, correct?
>
> A: Correct.
>
> Q: So given a period of three seconds, that person would cover over the distance of a football field, correct?

---

[3] This question is a follow-up to a question about whether Ashford's "testimony" makes sense, but the question (and the answer) confusingly uses the word "they" in what appears to be a reference to some unidentified portions of the testimony.

A: Yes.

Q: Would it be possible, for this first calculation to be 6,157 feet, that's more than a mile away, correct?

A: Correct.

Q: *It wouldn't be possible for Mr. Ashford to see her at that distance, correct?*

A: *Not to be able to identify her.[4]*

Q: *And it wouldn't be possible, even at half of that distance, which is still over a half a mile, to see her and appropriately judge her speed and what she was doing, correct?*

A: *And also, if she's travelling at 70 miles an hour and Mr. Ashford enters the road at 20 to 25 miles an hour and then 30 seconds later he hasn't shifted from 7th to 8th because he said he was on his way to 8, well, that means he's got 30 seconds to shift.[5]*

---

[4] In this exchange, Fields' counsel appears to be attempting to elicit testimony that would undermine any claim by Ashford that he could see Fields as he entered the highway. But McDonald did not answer the question that was asked – whether Ashford could have "see[n]" Fields if she was 6,157 feet away from him. Instead, McDonald answered a different question – whether, at that distance, Ashford could have seen Fields clearly enough to "identify her." It is not clear what McDonald means by "identify her." For instance, it is not clear whether McDonald means (1) identify Fields specifically as the driver of the approaching vehicle, (2) identify that an unknown driver in a Ford Edge (the type of vehicle Fields was driving) was approaching, or (3) identify that an unknown driver in an unknown vehicle was approaching.

[5] In this exchange, Fields' counsel appears to be attempting to elicit testimony that Ashford could not have seen Fields and correctly judged her speed even if she was only 3,078 feet away from him. But McDonald did not answer that question. Indeed,

Q: So he's not even going to gain that speed. It's going to take him a long time to pick that speed up.

A Right.

(*Id.* at 47-49, PageID.2260-2261; emphasis added.)

McDonald also prepared a set of drawings at some unidentified point during his work.[6] (*Id.* at 39-42, PageID.2259-2260.) The drawings do not speak to whether Ashford left Fields enough time to avoid the crash. Instead, according to McDonald, the drawings purport to show that Ashford "didn't have to enter the road [from the shoulder] at 20 to 25" miles per hour and that Ashford "could have got up to 65 miles an hour on the shoulder and then entered." (*Id.* at 42, PageID.2260.)

Finally, McDonald conducted a computer calculation that he labeled "Skid Distance to Stop From Known Speed and Drag Factor."[7] This single calculation – which takes up roughly one-fifth of one page – shows only that if "a vehicle [is] traveling 70 [miles per hour], it's going to take 192 feet to stop without perception time reaction." (*Id.* at 30, PageID.2257.)

---

McDonald's response does not begin with a "yes" or any other express indication of agreement. Instead, McDonald vaguely begins his answer with "And also."

[6] The drawings were identified Exhibit 6 during McDonald's deposition and are included in the record here at ECF No. 81-1, PageID.2302-2306.

[7] This calculation was identified as Exhibit 4 during McDonald's deposition and is included in the record here at ECF No. 81-1, PageID.2300.

## II

Defendants moved to exclude McDonald's expert opinion testimony on June 26, 2019. (*See* Mot. to Exclude, ECF No. 81.)  In support of that motion, Defendants argued, among other things, that the Court should exclude McDonald's testimony because "his own unsupported speculative beliefs … are not the product of reliable principles and methods." (*Id.*, PageID.2196.)  Fields filed a response to the motion on July 17, 2019. (*See* Fields Resp. Br., ECF No. 82.)

Pursuant to Local Rule 7.1(f)(2), the Court concludes that oral argument is not necessary and would not aid its decision on Defendants' motion.

## III

Defendants argue that McDonald's proposed testimony does not satisfy the standards for the admission of opinion testimony set forth in Federal Rule of Evidence 702.  That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

FRE 702.

Under this rule, district courts have "broad discretion as [] 'gatekeeper[s]' to determine the admissibility" of expert testimony. *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000). In assessing proposed expert testimony, a district court must "determine whether [the] evidence 'both rests on a reliable foundation and is relevant to the task at hand.'" *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th. Cir. 2012) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)).

In *Daubert*, the Supreme Court stressed that there is no "definitive checklist or test" that a district court must apply when considering the reliability of expert testimony. *Daubert*, 509 U.S. at 590. Yet, at the same time, the Supreme Court identified "several factors that a district court should consider when evaluating the scientific validity [and reliability] of expert testimony, notably: the testability of the expert's hypotheses (whether they can be or have been tested), whether the expert's methodology has been subjected to peer review, the rate of error associated with the methodology, and whether the methodology is generally accepted within the scientific community." *Pride*, 218 F.3d at 577 (citing *Daubert*, 509 U.S. at 593-94). In addition, "*Daubert* and its progeny make clear that '[p]roposed [expert] testimony must be supported by appropriate validation.'" *Id.* at 578 (quoting *Daubert*, 509 U.S.

at 591). As the Sixth Circuit recognized following *Daubert*, "[t]he party seeking to have testimony admitted bears the burden of showing that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology; the expert's bald assurance of validity is not enough." *Smelser v. Norfolk S. Ry.*, 105 F.3d 299, 303 (6th Cir. 1997) (internal quotation marks omitted), *abrogated on other grounds by Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500 (6th Cir. 1998).

The *Daubert* "factors, while perhaps most apt in evaluating a purely scientific discipline, can also apply in evaluating non-scientific fields that are 'technical' or 'specialized' in nature." *United States v. Mallory*, 902 F.3d 584, 593 (6th Cir. 2018) (quoting *Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149-53 (1999)). However, these factors may not be useful in evaluating the reliability of some types of expert testimony, and thus applying the "factors [is] not mandatory in every case." *Id.* For instance, the *Daubert* factors may be "unhelpful" where an expert's opinion testimony is based entirely upon his personal knowledge and "practical experiences." *First Tenn. Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001); *see also Wood v. Wal-Mart Stores E., LP*, 576 F. App'x 470 (6th Cir. 2014) (same).

Finally, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit evidence that is connected to existing data by the *ipse dixit*

of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). In the end, "[t]he questions of what factors to apply and what conclusions to draw about an expert's reliability are entrusted to the district court's discretion." *Mallory*, 902 F.2d at 593; *see also Kuhmo Tire*, 526 U.S. at 141 ("[W]hether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine.").

## IV

As the "proponent" of McDonald's causation opinion testimony, Fields must "establish its admissibility by a preponderance of proof." *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001). More specifically, Fields "bears the burden of showing, among other things, that [McDonald's] opinion is based on a reliable foundation." *Harms v. United States*, 2017 WL 3642202, at *9 (E.D. Mich. Aug. 24, 2017).[8] She has failed to carry that burden.

---

[8] *See also Berry v. Crown Equip. Corp.*, 108 F. Supp. 2d 743, 754 (E.D. Mich. 2000) ("It is [p]laintiff's burden to establish by a preponderance of evidence that her expert's theories are reliable and adequately supported by sound technical data, methodology and testing."); *Stevens v. Nat. Liability & Fire Ins. Co.*, 2015 WL 5567758, at *2 (E.D. Mich. Sept. 21, 2015) ("The proponent of expert testimony … has the burden of showing by a preponderance that her experts are qualified and their methods reliable."); *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir 2004) (internal quotation marks omitted) ("The proponent of expert testimony always bears the burden to show that … the methodology by which the expert reach[ed] his conclusions is sufficiently reliable ….").

## A

According to Fields, McDonald's causation opinions are reliable because McDonald showed how the "empirical evidence … makes crystal clear that [Ashford] left [Fields] no time at all to avoid [the] collision." (Fields Resp. Br., ECF No. 82, PageID.2337.)  That is simply not true.  Indeed, McDonald testified that he did not conduct any analysis that would allow him to "say" that Fields "didn't have enough time" to avoid Ashford's semi-truck. (McDonald Dep. at 35, ECF No. 81-1, PageID.2258.)  McDonald further acknowledged that he could not explain why Fields did not brake before she collided with Ashford's truck, could not explain why she did not swerve to avoid the truck, and could not explain why she did not slow down in any way. (*See id.* at 34, PageID.2258.)  Moreover, McDonald never determined how fast Fields was travelling at the time of the crash, and he never factored in "perception-reaction time" when determining whether Fields had an opportunity to stop before she hit Ashford's truck. (*Id*. at 29-30, PageID.2257.)  As all of this makes clear, McDonald had no reliable basis on which to testify that Ashford left Fields with no time to avoid the collision.  Thus, the Court will not permit McDonald to offer opinion testimony that Ashford caused the accident by leaving Fields with no opportunity to avoid hitting his truck when he merged into her lane.

**B**

Fields has also failed to establish that any other aspects of McDonald's causation opinions are based upon a reliable foundation. The fundamental flaw with McDonald's opinions is that they do not rest upon any discernible methodology at all, much less a methodology that may be deemed reliable. As described above, in McDonald's report, he identified some background facts related to the accident and then simply asserted that Ashford's driving caused the accident. His report contains no reasoning or analysis at all. Then, during McDonald's deposition, he failed to provide a chain of technical or scientific reasoning or analysis to explain *how* Ashford's driving caused the crash.[9] Instead, he described some driving by Ashford and described some drawings and calculations, but he never offered a cogent explanation as to how he pieced these facts and materials together to support the conclusion that Ashford caused the accident by leaving Fields with no time to avoid the wreck. Numerous courts have excluded proposed causation testimony by

---

[9] It is, of course, no answer to say that Ashford's entry into Fields' lane of travel obviously caused the accident and thus McDonald had no need to explain the basis of his causation theory. If it is *obvious* that Ashford's merge into Fields' lane caused the accident, then there is no basis to allow McDonald to present *expert* testimony on causation. *See*, *e.g.*, *Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998) (affirming exclusion of expert witness and noting that proposed expert "must testify to something more than what is obvious to the layperson in order to be of any particular assistance to the jury") (internal quotation marks omitted); *cf. Dawson v. Delaware*, 503 U.S. 159, 171 (1992) (Blackman, J., concurring) ("Jurors do not leave their knowledge of the world behind when they enter a courtroom and they do not need to have the obvious spelled out in painstaking detail.").

accident reconstruction experts who similarly failed to identify a reliable methodology (or any methodology at all) for their opinions.

The decision in *Reynolds v. Freightliner, LLC*, 2006 WL 5249744 (E.D. Ky. June 21, 2006), is instructive. In *Reynolds*, the plaintiff sought damages for fatal injuries suffered by her husband when he was "ejected from the cab of the truck he was driving." *Id.* at *1. Plaintiff alleged, among other things, that the "design and manufacture of both the seatbelt and the door latch of the tractor" were defective. *Id.* In support of that argument, the plaintiff sought to introduce the expert testimony of an accident reconstructionist, Stephen Chewning. *See id.* at *2. In a "one and a half page" initial expert report, Chewning sought to explain how the decedent was ejected from the truck. *Id.*

The defendant moved to exclude Chewning's expert testimony, and the district court granted that motion. The court concluded that Chewning's expert opinions were not admissible because Chewning had failed to identify any "particular methodology" that he used "to actually reach his opinions" and had failed to "supply[] the reasons/bases underlying his conclusions." *Id.* at *4 (internal emphasis removed). In relevant part, the court held that:

> In the instant case, Freightliner's major criticism of Chewning's report-that it lacks any methodology at all-is well-taken. Without any identifiable method of reasoning, Chewning's testimony is facially unreliable. **In both the Original and Supplemental Report, Chewning fails to explain how, given the facts and data he relied upon,**

**he reaches the conclusions outlined in his report. Chewning simply states his conclusions without employing any discernable methodology at all**. In particular, Chewning opines on the forces imparted to and against Mr. Reynolds' body such that he concludes sufficient force was exerted to break the seatbelt from its floor attachment and to then exert enough force to push open the driver's door with his body, and finally to cause a high-side ejection. [R. 64, Attach. 3]. Absent some formulaic process involving engineering or other mathematical principles, the Court is unable to determine how Chewning could have surmised or even began to calculate the forces involved in this accident and which are impliedly necessary to reach his conclusions. **The report lacks any evidence that Chewning utilized any demonstrable methodology to reach these conclusions.** Chewning simply states his conclusions regarding complex matters of force and product design based on his "analysis." [*Id.*]. Any explanation or identification of this "analyis" [sic] is missing from the report. In determining whether a particular methodology is reliable, this Court is not required to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *See Kumho Tire Co.,* 526 U.S. at 158. Because of this deficiency, Freightliner correctly argues that it is unable to validate or otherwise evaluate Chewning's testimony because it cannot be subjected to replication or testing, and that such testing is required to ensure it's reliability under *Daubert.*

Instead of putting forth the actual methodology used by Chewning, Reynolds responds by arguing that Chewning uses the same methodology as others in the field and that the ability to test a methodology is not required to sustain its reliability. [R. 64]. Reynolds relies primarily on Clark *v. Chrysler Corp.*, 310 F.3d 361 (6th Cir. 2003) and *Clay v. Ford Motor Co.*, 215 F.3d 663 (6th Cir. 2000). Both cases are distinguishable because Reynolds argument essentially puts the proverbial "cart before the horse." Without the actual methodology before it, the

> Court cannot take the next step to determine whether
> testing makes it more or less reliable, or whether it is of
> the kind that it utilized by others in the field. **It is the
> absence of a methodology that makes Chewning's
> testimony patently unreliable.**

*Id.* at ** 8-9 (emphasis added).

The court in *Neal v. Fort*, 2017 WL 455499 (M.D. Tenn. Jan. 20, 2017), reached the same conclusion. *Neal* was a "personal injury case centered on a car wreck." *Id.* at *1. "The parties fundamentally disagree[d] as to the cause of the accident." *Id.* In support of defendant's version of events, defendant sought to introduce the expert testimony of David G. Huskey, an accident reconstructionist. *See id.* Huskey thereafter provided an expert report in which he "provide[d] a step-by-step breakdown of how he believe[d] the accident occurred." *Id.*

The district court granted plaintiff's motion to exclude Huskey's opinion testimony on the ground that his report failed to identify his methodology:

> **Mr. Huskey's Report is virtually devoid of any
> methodology and, without any identifiable method of
> reasoning, his testimony is facially unreliable.**
> Defendant argues that "Mr. Huskey's analysis of the
> traffic crash includes diagrams of how the vehicles
> received the corresponding damage, an evaluation of the
> heights of the damage to the vehicles correlated with the
> heights of the two vehicles, and an analysis of the rotation
> of the vehicles at impact," and that his "method of using
> photographs of the damaged cars and recreating how that
> damage occurred based [on] engineering principles and
> the facts presented by the parties is reliable." (*Id.* at p. 13.)
> However, the issue is that Mr. Huskey has not cited a
> single engineering principle, or indeed *any* principles.

**While it is undisputed that Mr. Huskey is highly experienced and qualified, that does not mean his methodologies are inherently reliable. Without employing a discernible methodology or sufficiently explaining how he reached these conclusions, the court is unable to examine the reliability of the analysis.** It is "well within" a district court's discretion to exclude expert testimony when there is an "absence of meaningful analysis or reasoning[.]" *See Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 664 (6th Cir. 2005) (citations omitted).

**Furthermore, the Report contains no explanation of how Mr. Huskey's experience informed his conclusions. Without such an explanation, there is simply too great an analytical gap between the facts of the case and the proffered opinion to permit Mr. Huskey's testimony to go to the jury.** While an expert's experience may be the basis for reliable testimony, it is not sufficient for an expert merely to recite his experience without further explanation.

[….]

It is undisputed that Mr. Huskey is a qualified accident reconstruction expert; however, **nothing in the record or Report describes how his experience led to his conclusions or explains how he reliably applied his experience to the facts of the case.**

*Id.* at *4 (emphasis added).

McDonald's causation opinions suffer from the precise flaws that led the courts in *Reynolds* and *Neal* to exclude the proposed causation opinions. Like the expert in *Neal*, McDonald has not "describe[d] how his experience led to his conclusions," nor has he "explain[ed] how he reliably applied his experience to the

facts of the case." *Id.* And, like the excluded expert in *Reynolds*, McDonald has not presented "any identifiable method of reasoning" and he has failed to "explain how, given the facts and data he relied upon, he reach[ed] the conclusions outlined in his report" and deposition. *Reynolds*, 2006 WL 5249744, at *8. Thus, as in *Neal* and *Reynolds*, "the absence of a methodology" makes McDonald's "testimony patently unreliable" and inadmissible. *Id.* at *9; *see also Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 904-06 (Tex. 2004) (requiring exclusion of causation testimony by accident reconstruction expert who "never explain[ed] how [certain] tests supported his conclusions" and did not "explain how any of the research or tests he relied on support his conclusion").

## C

There are additional reasons to question the reliability of the manner in which McDonald reached his conclusions. For instance, Fields has not shown that McDonald's causation testimony satisfies any of the *Daubert* factors. Fields has not presented evidence that McDonald applied generally accepted causation-analysis methods, that McDonald used techniques that had been tested or whose error-rates had been determined, or that McDonald used any peer-reviewed approaches to causation analysis. Nor has Fields presented evidence that McDonald's work in this case has been validated in any way. Fields' failure to show that McDonald's testimony satisfies the *Daubert* factors, while not dispositive, further weighs against

admission of McDonald's testimony. *See*, *e.g.*, *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 407-08 (6th Cir. 2006) (excluding proposed expert testimony where, among other things, the expert's "methodology had never been tested, subjected to peer review, possessed a known or potential rate of error, or enjoyed general acceptance"); *Pride*, 218 F.3d at 578 (holding that "[t]he failure of [plaintiff's] experts to test their hypotheses in a timely and reliable manner or to validate their hypotheses by reference to generally accepted scientific principles as applied to the facts of this case renders their testimony on [causation] unreliable and therefore inadmissible under *Daubert* and Federal Rules of Evidence 702 and 104").

In addition, it appears that McDonald's work fell below the standard of practice employed by the International Association of Accident Reconstruction Specialists ("IAARS"), a group to which McDonald belongs. In order to become a member of IAARS, an applicant must submit an "example of accident reconstruction work" that the applicant has completed. (ECF No. 81-1, PageID.2313.) That "example" must include a "scale diagram, photographs, measurements, [and] all calculations done to arrive at speeds, angles, [and] distances." (*Id.*) Yet in this case, McDonald reached his causation opinion and issued his report before he had done much of this work (if he completed it at all). (*See* McDonald Dep. at 24-25, ECF No. 81-1, PageID.2255-2256.)

Finally, Fields' own submissions to the Court appear to suggest that McDonald's work on this case may fall short of the work that he has done on other cases. In Fields' words, McDonald "has [an] extensive background in [] accident reconstruction including vehicle inspection, geometric construction, scale drawings of collisions and scenes, scene examination, speed determinations, time distance determinations, impact analysis, lamp examination, and conservation of linear momentum." (Fields Resp. Br., ECF No. 82, PageID.2335.) Yet here, McDonald performed few, if any, of these analyses before he issued his report containing his opinions, and that lends further support to the Court's conclusion that his opinions were not based on reliable methods. *See*, *e.g.*, *Mahoney v. USA Hockey, Inc.*, 138 F. App'x 804 (6th Cir. 2005) (affirming exclusion of expert witness where, among other things, proposed expert did not "attempt to replicate the incident, perform any manner of accident reconstruction or conduct any relevant technical or scientific testing").

## D

Fields counters that McDonald's proposed causation testimony is based on reliable methods and is therefore admissible. The Court does not find her arguments to be persuasive.

Fields argues that McDonald's work is reliable because he "made *numerous* mathematical calculations to check and support his conclusion[]" that Ashford

caused the accident by leaving Fields no time to avoid his truck. (Fields Resp. Br., ECF No. 82, PageID.2336; emphasis added.)   There are several problems with this argument.  First, as noted above, McDonald admitted that his work does *not* permit him to reliably say that Fields did not have enough time to avoid the wreck.  Second, Fields never offers a coherent explanation as to how McDonald's calculations show that Ashford left Fields without enough time to avoid the accident.  Indeed, as set forth above (in Section (I)(C)(4)), McDonald's testimony concerning the calculations is not comprehensible in any meaningful way.  Third, Fields vastly overstates the extent of the mathematical calculations.  McDonald made a limited number of calculations that appear on one and one-quarter pages of paper. (*See* ECF No. 81-1, PageID.2300-2301.)  And McDonald admitted that a sizeable portion of those calculations – including the calculations based upon Fields' purported speed of 92 miles per hour – address circumstances that, according to McDonald, did not exist at the time of the accident. (*See* McDonald Dep. at 38-39, ECF No. 81-1, PageID.2259.)  Fourth, many of McDonald's calculations were completed nearly a year *after* McDonald drafted his expert report and reached the conclusion that Ashford was "a hundred percent" at fault for the crash. (*See id.* at 25, PageID.2256.) Finally, Fields has not cited any evidence that the calculations McDonald performed

are the types of calculations that other experts in the accident reconstruction field rely upon when making causation determinations.[10]

Finally, Fields argues that the Court should find McDonald's causation opinions to be reliable because they are like the opinion testimony that the Sixth Circuit deemed admissible in *Dilts v. United Grp. Servs., LLC*, 500 F. App'x 440 (6th Cir. 2012). In *Dilts*, the expert inspected the defective crane at issue, conducted a generally accepted photographic measurement analysis, and used a computer program to identify damage to the crane:

> **At his deposition, Nightenhelser [the expert] testified that he inspected the crane's straps, shackles, and cable of the rigging and the dislodged panel at the accident site**. Upon inspection, he observed a depression on or near one corner of the panel and some yellow paint. He also testified that the end pieces on each end of the panel were "bent, canted inward," which meant that both ends of the panel struck support surfaces during the fall, causing an inward bent. Nightenhelser determined that the shape of the depression was consistent with the shape of the handrail. **Based on the physical evidence, he concluded that the panel rotated counterclockwise 180**

---

[10] Fields further suggests that McDonald's causation opinion is reliable because McDonald calculated that it took Ashford "two seconds" to merge from the shoulder into Fields' lane of traffic. (Fields Resp. Br., ECF No. 82, PageID.2337.) But McDonald did not conduct that calculation prior to reaching his opinion and drafting his expert report. Instead, he calculated it "in [his] head" during his deposition, and he did not "have any kind of evidence or written-out calculation" to support that computation. (McDonald Dep. at 31, ECF No. 81-1, PageID.2257.) Moreover, McDonald acknowledged that he did not "review any kind of publications, article[s], or treatise[s] regarding tractor-trailers and their ability to merge lanes" before conducting that calculation and that the calculation was not based on any "scientific" knowledge. (*Id.*)

**degrees and struck the yellow handrail located in between the top of the doghouse and the ground, which caused the downward depression in the panel**. He further concluded that the scrape marks on the panel demonstrated that the panel contacted the I-beam and shifted out of position against the ductwork of the doghouse structure.

**Nightenhelser also conducted a photogrammetric analysis, which entails using known measurements of objects in a photograph to extract measurements of, or measurements to, objects that are not known**. In addition, he performed calculations and algebraic equations using a computer program to determine the length and width of the panel. **He testified that after conducting his inspections at the accident site he put a digital photograph on a computer screen, used a mouse to identify points and create vectors of the crane and the panel, and then inserted that information into a computer program to determine the natural position of the shackles and also to identify the damage on the I-beam**. Based on his analysis, Nightenhelser concluded that the only mechanism that could lift the panel out of position to strike the I-beam and then rotate 180 degrees was the crane.

*Id.* at 445-46 (emphasis added).

Unlike the expert admitted in *Dilts*, McDonald did not visit the scene of the accident, did not inspect Ashford's truck, and did not create any models, simulations, or animations related to the accident before reaching his opinion. McDonald is not in the same position as the expert in *Dilts*, and *Dilts* therefore does not compel the conclusion that McDonald's opinions are based on reliable methods.

Fields also argues that the Sixth Circuit's decision in *Clark v. Chrysler Corp.*, 310 F.3d 461, 470-71 (6th Cir. 2002), supports admission of McDonald's testimony. The Court disagrees. In *Clark*, the Sixth Circuit held that the district court did not abuse its discretion in admitting opinion testimony from an accident reconstructionist. But there was no showing in *Clark*, as there has been here, that the accident reconstructionist failed to employ any recognizable methodology. Thus, *Clark* does not compel the admission of McDonald's testimony. *See Reynolds*, 2006 WL 5249744, at *10 (explaining that *Clark* does not support admission of opinion testimony by accident reconstructionist who does not use a clear methodology). In any event, the holding of *Clark* was simply that the district court did not abuse its discretion in admitting the accident reconstructionist's testimony; the decision does not stand for the additional proposition that it would have been an abuse of discretion to exclude that testimony. The Court declines to admit McDonald's testimony pursuant to *Clark*.

**E**

For all of the reasons explained above, the Court concludes that Fields has failed to demonstrate that any of McDonald's opinions concerning the cause of the accident rest upon a reliable foundation. Accordingly, the Court will exclude McDonald's proposed causation testimony in its entirety.

# V

As noted above, as one component of McDonald's overall causation opinion, McDonald testified that Ashford was driving "below the minimum speed [established by the Michigan Motor Vehicle Code] for commercial vehicles on the freeway." (McDonald Dep. at 24, 26, 46, ECF No. 81-1, PageID.2255, 2256. 2261.[11]) Because the Court has excluded McDonald's proposed causation testimony in its entirety (including all components of that testimony), Fields will not be permitted to present this aspect of McDonald's causation opinion.

The Court notes that there is an additional and independent ground for excluding McDonald's testimony that Ashford was traveling below the minimum required speed: that testimony is not based upon scientific or technical principles or knowledge, is unnecessary, and is not helpful to the jury. McDonald did not calculate Ashford's speed nor perform an analysis to determine whether Ashford was traveling below the minimum speed. (*See id.* at 32, PageID.2257.) Instead, McDonald simply compared (1) Ashford's testimony that he entered the freeway at 20-to-25 miles per hour to (2) the minimum freeway speed established under the Michigan Motor Vehicle Code. (*See id.* at 26-28, 32, PageID.2256, 2257.) That comparison does not require any specialized training or knowledge. Indeed, every

---

[11] McDonald's testimony cited at the later pages above makes clear that his opinion is tied to the minimum speed under the Motor Vehicle Code.

juror will be able to make the very same comparison – of Ashford's admitted speed to the Motor Vehicle Code's minimum freeway speed – without any assistance from McDonald.    Simply put, there is no basis or need for opinion testimony by McDonald that Ashford was driving below the minimum speed.  The Court would therefore exclude McDonald's testimony that Ashford was travelling below the minimum required speed on this alternative basis as well.[12]

## VI

For all of the reasons stated above, the Court **GRANTS** Defendants' motion to exclude McDonald's testimony (ECF No. 81) and **EXCLUDES** McDonald from offering any opinion testimony at trial.

The Court previously denied without prejudice Defendants' motion for summary judgment pending the Court's consideration of Defendants' motion to

---

[12] Moreover, there is at least some authority for the proposition that a court should not allow an expert to provide opinion testimony that a party violated a state's motor vehicle code because that testimony states a legal conclusion. *See*, *e.g.*, *Carvajal v. H&M Enters. & Logistics of Statesville, Inc.*, 2014 WL 5072726, at *3 (C.D. Cal. Oct. 6, 2014) (excluding expert witness where expert sought to testify that the "plaintiff did not violate any traffic laws" because that testimony "would constitute a legal conclusion on the ultimate issue of fact"); *Glass v. Anne Arundel Cty.*, 38 F. Supp. 3d 705, 717 (D. Md. 2014) (excluding portion of expert report where expert opined that plaintiff "followed [defendant] too closely" because "this is a conclusion about whether [plaintiff] violated the law"); *Karahodzic v. JBS Carriers Inc.*, 2015 WL 11181973, at *6 (S.D. Ill. Apr. 27, 2015) (holding "experts may not opine on whether defendants' actions violated Illinois' statutes governing merging traffic (625 ILCS 5/11-905) and minimum speed regulations (625 ILCS 5/11-606), as such opinions constitute legal conclusions").

exclude McDonald's testimony. (*See* Order, ECF No. 80.)  At that time, the Court told Defendants that it would "allow [them] to renew [their] motion for summary judgment" after the Court ruled on the admissibility of McDonald's testimony. (*Id.*, PageID.2192.)  If Defendants wish to file a renewed motion for summary judgment, they shall do so by no later than **November 26, 2019**.

　　　　**IT IS SO ORDERED**.

　　　　　　　　　　　　　s/Matthew F. Leitman
　　　　　　　　　　　　　MATTHEW F. LEITMAN
　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE

Dated:  November 5, 2019


　　　　I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on November 5, 2019, by electronic means and/or ordinary mail.

　　　　　　　　　　　　　s/ Holly A. Monda
　　　　　　　　　　　　　Case Manager
　　　　　　　　　　　　　(810) 341-9764